Richard M. Garbarini
GARBARINI FITZGERALD P.C.
250 Park Ave, 7th Floor,
New York, New York 10177
Phone: (212) 300-5358
Fax: (888) 265-7054

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

| | |
|---|---|
| YESH MUSIC, LLC, | Case No.: 18-cv-7171 |
| Plaintiff, | **ECF CASE** |
| v. | **COMPLAINT AND JURY DEMAND FOR DAMAGES FOR COPYRIGHT INFRINGEMENT** |
| PLAYNETWORK, INC., | |
| Defendant. | |

-----------------------------------------------------------------x

Plaintiff YESH MUSIC, LLC, by and through the undersigned counsel, brings this Complaint and Jury Demand against defendant PLAYNETWORK, INC. ("PLAY") for damages based on copyright infringement and related claims pursuant to the Copyright Act and Copyright Revisions Act, 17 U.S.C. §§ 101, et seq. ("the Copyright Act" or "Act"). Plaintiff alleges below, upon personal knowledge as to itself, and upon information and belief as to other matters so indicated.

## JURISDICTION

1. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1338(a) (jurisdiction over copyright actions).

2. This Court has *in personam* jurisdiction over the defendant because the defendant has a headquarters in this Judicial District. In May 2017, PLAY merged with New York

company TouchTunes Interactive Network and the combined company's headquarters are located at New York City and Seattle,

3. PLAY regularly contracts with advertising and creative agencies in New York.

4. PLAY provides music for approximately 68,000 stores every month. A significant number of those stores are in this Judicial District. For example, PLAY was retained to provide the music for the Adidas flagship store in this Judicial District.

5. PLAY claims: "TouchTunes and PlayNetwork reportedly serve more than 450 clients, reaching over a 100 million consumers daily. The company's media products are deployed in more than 185,000 locations in 125 countries." PLAY's key markets are New York and Los Angeles.

6. PLAY's website located at www.playnetwork.com states: "The combined company has headquarters in New York City and Seattle, and North American offices in Chicago, Columbus, Los Angeles, Montreal and Vancouver. Its overseas offices are located in Hong Kong, London and Santiago."

7. PLAY has established contacts within this Judicial District, sufficient to permit the exercise of personal jurisdiction. CPLR § 302 (a)(3) authorizes this Court to exercise jurisdiction over nondomiciliaries who commit a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if it: (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

## VENUE

8.  Venue in this district is proper under 28 U.S.C. § 1391(b) and (c) and/or 28 U.S.C. § 1400(a).

9.  Plaintiff has the right to bring the within action pursuant to 17 U.S.C. § 501(b).

10. Plaintiff's Copyrighted Recordings were registered prior to the alleged infringements, and satisfy the registration prerequisite under 17 U.S.C. 412(c). See **Exhibit 1**.

## PARTIES

11. At all times material hereto, plaintiff YESH MUSIC, LLC was, and is, a company organized under the laws of New York state with a principal place of business located at 75-10 197th Street, Flushing, New York. YESH is the sole beneficial rights holder to the Copyrighted Recordings identified herein.

2.  Upon information and belief, defendant PLAYNETWORK, INC. is a Washington corporation with its principal place of business in Redmond, Washington.

## FACTS

12. Plaintiff YESH is the assignee and sole beneficial owner of all rights associated with the seventeen musical recordings titled:

| Title | Registration No. |
| --- | --- |
| AGE OF WONDER | SR713231 |
| BUMP | SR173282 |
| CIRCUITS | SR713237 |
| EQUINOX | SR713239 |
| FADE IN OUT | SR713232 |
| A FEW WORDS | SR713230 |
| FLOOD | SR713252 |
| LANDING | SR713756 |
| LIGHTS DIM (ALT MIX) | SR713284 |
| NEAR EAST | SR713764 |
| OIL AND WATER | SR713234 |
| PAR AVION | SR708493 |
| RED LETTER | SR713236 |
| SECOND SIGHT | SR713242 |

     SHADOWS         SR713233
     STARSCAPES (ALT MIX)   SR713289
     WE'RE HITTING EVERYTHING SR713288
     WHERE WE ARE      SR713759

13. The above represent the "Copyrighted Recordings."

14. The two members of plaintiff are professional full-time musicians who earn a living from licensing and streaming their musical recordings.

15. PLAY is a provider of in-store entertainment for retail, restaurant, and hospitality environments.

16. Customers in stores like the Adidas flagship store in Manhattan experience a curated playlist provided by PLAY.

17. On or about July 24, 2014, the parties executed two on-line agreements, one for PLAY to license the sound recordings (or master recordings) associated with the Copyrighted Recordings, and one for the Recordings associated with the Copyrighted Recordings (the "Agreements"). See **Exhibit 2**.

18. Defendant did not provide plaintiff with a copy of either of the signed on-line Agreements.

19. Plaintiff was able to download un-signed identical copies of the signed Agreements which are attached as **Exhibit 2.**

20. The Agreements provide (in identical language) at Clause 2:

> Term & Territory. This Agreement **will commence as of the first day of the month following the full execution of this Agreement** (the "Effective Date") and will continue through the last day of the calendar quarter following the third anniversary of the Effective Date (the "Initial Period"), **after which it will renew automatically for successive periods of one (1) year**, each a "Renewal Period," unless terminated by either Party as provided in this Section 2. **Either Party may terminate this Agreement, effective as of the end of the Initial Period or any Renewal Period, by notice to the other delivered not less than 90 days prior to the conclusion of the then-current period of the Agreement.**

4

>Notwithstanding anything to the contrary herein, following the expiration or other termination of this Agreement, **Licensee will remove the Recordings (as defined below) from the Service as soon as possible, but in no event later than 90 days following such expiration or other termination** (the "Program Deletion Period"). The Initial Period, together with all Renewal Periods, if any, and the Program Deletion Period.

21. The "Initial Term" of the Agreements commenced on August 1, 2014; the first of the month following the execution of the Agreements, and was to run for three years, unless terminated.

22. In accordance with Clause 2 of the Agreements, plaintiff served notice dated April 9, 2018, by certified mail, informing defendant that plaintiff was terminating the Agreements and the Copyrighted Recordings must be removed from defendant's catalogue. See **Exhibit 3**.

23. PLAY received the Termination on April 11, 2017.

24. The Notice of Termination was served on defendant more than 90 days prior to the end of the Initial Period which ended on September 30, 2018.

25. No later than July 14, 2017, defendant was obligated to remove and cease licensing the Copyrighted Recordings.

26. To be clear, defendant was obligated to remove plaintiff's Copyrighted Recordings as soon as commercially possible. Defendant could easily have removed the Copyrighted Recordings from its catalogue the same day it received the Notice of Termination.

27. The actual process of removal takes PLAY several minutes.

28. Defendant elected, however, to infringe plaintiff's rights as set forth in Section 106 of the Copyright Act. PLAY copied, distributed, and publicly performed the Copyrighted Recordings for at least six (6) months after the final Termination Date.

29.     In December 2017 alone, there were 1,019 uses by defendants of the Copyrighted Recordings. See below.



30.     The above chart was generated by Music Reports, a company that handles the collection and distribution of publishing royalties.

31.     As the attached spreadsheet generated by Music Reports shows, all of the Copyrighted Recordings were streamed by defendant for six (6) months after the last possible date it was allowed to do so.

32.     Six (6) months is not a ministerial error, particularly in light of the fact that the Copyrighted Recordings should have been removed in April 2017.

33.     Plaintiff received a single check from PLAY, dated February 17. 2018 for $7.90.

34.     A careful review of the royalties that were reported show very clearly that PLAY does not accurately report the number of plays (which generates royalties).

35. One example is plaintiff's recording Starscapes. That recording has consistently been one of the two highest licensed and streamed recordings in plaintiff's catalogue which contains over 130 unique recordings.

36. For the first quarter of 2017, defendant reported 237 plays of Starscapes (Alt Mix). First, that is impossible. Plaintiff created four (4) "alt-mix" versions of their recordings, none of which were released to the public. The "alt-mix" recordings were created exclusively for plaintiff's licensing agents only.

37. Plaintiff sent defendant its catalogue at the time the Agreements were executed, but the "alt-mix" recordings were not included in that catalogue.

38. In the second quarter of 2017, PLAY reported 351 plays of Starscapes ("Alt-Mix").

39. The third quarter report shows Starscapes (Alt-Mix") was played 242 times.

40. So far, the recording Starscapes ("Alt-Mix) was consistently played in all three quarters nearly the identical number of times in each quarter.

41. In the fourth quarter, Starscapes (Alt-Mix") was reportedly played 99 times.

42. There is no possible explanation for such a precipitous drop in the number of plays, when defendant is the entity playing the recording.

43. Defendant reported zero plays of plaintiff's recording Anything You Can Synthesize which is by far plaintiff's most popular recording which has been streamed over ten million times.

44. These facts create a clear pattern of error and inconsistency which show the royalties reported cannot possibly be accurate.

45.     Further, it took ten (10) months to generate a check after termination of the Agreements.  That is not commercially reasonable, and plaintiff's inability to have access to the royalties it earned damaged it.  While $7.90 is not a substantial amount, defendant's retention of royalties, for thousands of musicians is a substantial amount.

46.     What it does demonstrate is the fact that defendant waited until after December 31, 2017 (when it stopped reporting the use of the Copyrighted Recordings) to pay plaintiff the royalties it had earned.  Defendant knew it was going to continue to infringe until December 31, 2017, so it waited to pay plaintiff its royalties.

47.     Defendant has knowingly and intentionally infringed plaintiff's rights provided under Section 106 of the Copyright Act, and clearly has a business practice set up to line their pockets at the expense of musicians and composers.

## FIRST CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT

48.     Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

49.     It cannot be disputed that the plaintiff has a valid, registered copyright, and owns all rights to the Copyrighted Recordings.

50.     Defendant, without authority from plaintiff, reproduced, synchronized, publicly displayed, and/or publicly distributed a video advertisement embodying plaintiff's Copyrighted Recordings.

51.     Defendant refused to stop copying, distributing, and publicly performing the Copyrighted Records for eight (8) months after notice was served.

52.     Defendant has intentionally infringed (pursuant to Section 504(c)) plaintiff's exclusive rights set forth in Section 106 of the Act, and elsewhere.

53. Defendant's use of the Copyrighted Recordings was not for criticism, comment, news reporting, teaching, scholarship, or research.

54. Defendant's use was not transformative.

55. Defendant elected to reproduce, synchronize, and distribute plaintiff's Copyrighted Recordings, using the entirety of the song, without a license.

56. Defendant has intentionality infringed plaintiff's rights under Section 106 of the Act.

57. As a direct and proximate result of defendant's infringements, plaintiff has incurred damages, and requests an award of defendant's profits, and plaintiff's loss, plus costs, interest, and attorneys' fees. Plaintiff may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement of up to $150,000, but not less than $30,000.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against defendant, and awarding plaintiff as follows:

1. restitution of defendant's unlawful proceeds;

2. compensatory damages in an amount to be ascertained at trial;

3. statutory damages to plaintiff according to proof, including but not limited to all penalties authorized by the Copyright Act (17 U.S.C. §§ 504(c)(1), 504(c)(2));

4. reasonable attorneys' fees and costs (17 U.S.C. § 505);

5. pre- and post-judgment interest to the extent allowable;

6. such other and further relief that the Court may deem just and proper.

### Jury Demand

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: August 9, 2018            GARBARINI FITZGERALD P.C.

New York, New York

By: *[signature]*

Richard M. Garbarini (RG 5496)

10